# EDMOND *v.* UNITED STATES

No. 96–262.   Argued February 24, 1997—Decided May 19, 1997*

---

*Together with *Lazenby* v. *United States; Leaver* v. *United States; Leonard* v. *United States; Nichols* v. *United States;* and *Venable* v. *United States,* also on certiorari to the same court (see this Court's Rule 12.4).

*Alan B. Morrison* argued the cause for petitioners. With him on the briefs was *Allen Lotz.*

*Malcolm L. Stewart* argued the cause for the United States. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Dreeben, Douglas N. Letter, Nancy E. McFadden, Paul M. Geier, Peter J. Plocki,* and *Frank R. Levi.*

JUSTICE SCALIA delivered the opinion of the Court.

We must determine in this case whether Congress has authorized the Secretary of Transportation to appoint civilian members of the Coast Guard Court of Criminal Appeals, and if so, whether this authorization is constitutional under the Appointments Clause of Article II.

## I

The Coast Guard Court of Criminal Appeals (formerly known as the Coast Guard Court of Military Review) is an intermediate court within the military justice system. It is one of four military Courts of Criminal Appeals; others exist for the Army, the Air Force, and the Navy-Marine Corps. The Coast Guard Court of Criminal Appeals hears appeals from the decisions of courts-martial, and its decisions are subject to review by the United States Court of Appeals for the Armed Forces (formerly known as the United States Court of Military Appeals).[1]

Appellate military judges who are assigned to a Court of Criminal Appeals must be members of the bar, but may be commissioned officers or civilians. Art. 66(a), Uniform Code of Military Justice (UCMJ), 10 U. S. C. § 866(a). During the times relevant to this case, the Coast Guard Court of Criminal Appeals has had two civilian members, Chief Judge Joseph H. Baum and Associate Judge Alfred F. Bridgman, Jr. These judges were originally assigned to serve on the court by the General Counsel of the Department of Transportation,

---

[1] The names of the Courts of Military Review and of the United States Court of Military Appeals were changed, effective October 5, 1994, by Pub. L. 103–337, § 924, 108 Stat. 2831.

who is, ex officio, the Judge Advocate General of the Coast Guard, Art. 1(1), UCMJ, 10 U. S. C. § 801(1). Subsequent events, however, called into question the validity of these assignments.

In *Weiss* v. *United States*, 510 U. S. 163 (1994), we considered whether the assignment of commissioned military officers to serve as military judges without reappointment under the Appointments Clause was constitutional. We held that military trial and appellate judges are officers of the United States and must be appointed pursuant to the Appointments Clause. *Id.*, at 170. We upheld the judicial assignments at issue in *Weiss* because each of the military judges had been previously appointed by the President as a commissioned military officer, and was serving on active duty under that commission at the time he was assigned to a military court. We noted, however, that "allowing civilians to be assigned to Courts of Military Review, without being appointed pursuant to the Appointments Clause, obviously presents a quite different question." *Id.*, at 170, n. 4.

In anticipation of our decision in *Weiss*, Chief Judge Baum sent a memorandum to the Chief Counsel of the Coast Guard requesting that the Secretary, in his capacity as a department head, reappoint the judges so the court would be constitutionally valid beyond any doubt. See *United States* v. *Senior*, 36 M. J. 1016, 1018 (C. G. C. M. R. 1993). On January 15, 1993, the Secretary of Transportation issued a memorandum "adopting" the General Counsel's assignments to the Coast Guard Court of Military Review "as judicial appointments of my own." The memorandum then listed the names of "[t]hose judges presently assigned and appointed by me," including Chief Judge Baum and Judge Bridgman. Addendum to Brief for Petitioners A6.

Two Terms ago, in *Ryder* v. *United States*, 515 U. S. 177 (1995), we considered the validity of a conviction that had been affirmed by a panel of the Coast Guard Court of Military Review, including its two civilian members, before the

secretarial appointments of January 15, 1993. The Government conceded that the civilian judges of the Court of Military Review had not been appointed pursuant to the Appointments Clause, see Brief for United States in *Ryder* v. *United States*, O. T. 1994, No. 94–431, p. 9, n. 9, but argued that Ryder's conviction should be affirmed notwithstanding this defect. We disagreed, holding that Ryder was "entitled to a hearing before a properly appointed panel of" the Coast Guard Court of Military Review. 515 U. S., at 188. We did not consider the validity of convictions affirmed by the court after the secretarial appointments.

Each of the petitioners in the present case was convicted by court-martial. In each case the conviction and sentence were affirmed, in whole or in part, by the Coast Guard Court of Criminal Appeals (or its predecessor the Court of Military Review) after the January 15, 1993, secretarial appointments. Chief Judge Baum participated in each decision, and Judge Bridgman participated in the appeals involving two of the petitioners. The Court of Appeals for the Armed Forces affirmed the convictions, relying on its holding on remand in *United States* v. *Ryder*, 44 M. J. 9 (1996), that the Secretary of Transportation's appointments were valid and cured the defect that had previously existed. 45 M. J. 19 (1996); 44 M. J. 273 (1996); 44 M. J. 272 (1996). Petitioners sought review in a consolidated petition pursuant to this Court's Rule 12.4, and we granted certiorari, 519 U. S. 977 (1996).

II

Petitioners argue that the Secretary's civilian appointments to the Coast Guard Court of Criminal Appeals are invalid for two reasons: First, the Secretary lacks authority under 49 U. S. C. § 323(a) to appoint members of the court; second, judges of military Courts of Criminal Appeals are principal, not inferior, officers within the meaning of the Appointments Clause, and must therefore be appointed by the

President with the advice and consent of the Senate. We consider these contentions in turn.

Congress has established the Coast Guard as a military service and branch of the Armed Forces that, except in time of war (when it operates as a service within the Navy), is part of the Department of Transportation. 14 U. S. C. §§ 1–3. The Secretary of Transportation has broad authority over the Coast Guard, including the power to "promulgate such regulations and orders as he deems appropriate to carry out the provisions of [Title 14] or any other law applicable to the Coast Guard," § 633. The Commandant of the Coast Guard is required to "carry out duties and powers prescribed by the Secretary of Transportation," and he "reports directly to the Secretary." 49 U. S. C. § 108(b). Most relevant to the present case, § 323(a) provides: "The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers." Petitioners do not dispute that judges of the Coast Guard Court of Criminal Appeals are officers of the Department of Transportation. Thus, although the statute does not specifically mention Coast Guard judges, the plain language of § 323(a) appears to give the Secretary power to appoint them.

Petitioners argue, however, that § 323(a) is a default statute, applicable only where Congress has not otherwise provided for the appointment of specific officers. Petitioners contend that Article 66(a) of the UCMJ, 10 U. S. C. § 866(a), gives the Judge Advocate General of each military branch exclusive authority to appoint judges of his respective Court of Criminal Appeals. That provision reads as follows:

"Each Judge Advocate General shall establish a Court of Criminal Appeals which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges. . . . Appellate military judges who are assigned to a Court of

Criminal Appeals may be commissioned officers or civilians, each of whom must be a member of a bar of a Federal court or of the highest court of a State. The Judge Advocate General shall designate as chief judge one of the appellate military judges of the Court of Criminal Appeals established by him. The chief judge shall determine on which panels of the court the appellate judges assigned to the court will serve and which military judge assigned to the court will act as senior judge on each panel."

Were we to accept petitioners' interpretation of Article 66(a) as providing for the "appointment" of Court of Criminal Appeals judges, their argument that Congress intended it to be the exclusive means of appointment might prove persuasive. Ordinarily, where a specific provision conflicts with a general one, the specific governs. *Busic* v. *United States*, 446 U. S. 398, 406 (1980). Conspicuously absent from Article 66(a), however, is any mention of the "appointment" of military judges. Instead, the statute refers to judges "who are *assigned* to a Court of Criminal Appeals" (emphasis added). The difference between the power to "assign" officers to a particular task and the power to "appoint" those officers is not merely stylistic. In *Weiss*, we upheld the assignment of military officers to serve on military courts because they had previously been "appointed" as officers of the United States pursuant to the Appointments Clause, and because Congress had not designated the position of a military judge as one requiring reappointment. 510 U. S., at 176. We noted in *Weiss* that Congress has consistently used the word "appoint" with respect to military positions requiring a separate appointment, rather than using terms not found within the Appointments Clause, such as "assign": "Congress repeatedly and consistently distinguished between an office that would require a separate appointment and a position or duty to which one could be 'assigned' or 'detailed' by a superior

officer." *Id.*, at 172. We found it significant that the sections of the UCMJ relating to military judges "speak explicitly and exclusively in terms of 'detail' or 'assign'; nowhere in these sections is mention made of a separate appointment." *Ibid.* This analysis suggests that Article 66(a) concerns not the appointment of Court of Criminal Appeals judges, but only their assignment.

Moreover, we see no other way to interpret Article 66(a) that would make it consistent with the Constitution. Under the Appointments Clause, Congress could not give the Judge Advocates General power to "appoint" even inferior officers of the United States; that power can be conferred only upon the President, department heads, and courts of law. Thus, petitioners are asking us to interpret Article 66(a) in a manner that would render it clearly unconstitutional—which we must of course avoid doing if there is another reasonable interpretation available. *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 500 (1979); *Blodgett* v. *Holden,* 275 U. S. 142 (1927). Petitioners respond that reading § 323(a) to permit the Secretary to appoint Court of Criminal Appeals judges causes us unnecessarily to reach the constitutional question whether those judges are inferior officers under the Appointments Clause, since Congress may vest only the appointment of inferior officers in a department head. But a constitutional question confronted in order to preserve, if possible, a congressional enactment is not a constitutional question confronted unnecessarily.

We conclude that Article 66(a) does not give Judge Advocates General authority to appoint Court of Criminal Appeals judges; that § 323(a) does give the Secretary of Transportation authority to do so; and we turn to the constitutional question whether this is consistent with the Appointments Clause.

### III

The Appointments Clause of Article II of the Constitution reads as follows:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U. S. Const., Art. II, §2, cl. 2.

As we recognized in *Buckley* v. *Valeo*, 424 U. S. 1, 125 (1976) *(per curiam)*, the Appointments Clause of Article II is more than a matter of "etiquette or protocol"; it is among the significant structural safeguards of the constitutional scheme. By vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches. See *id.,* at 128–131; *Weiss, supra,* at 183–185 (SOUTER, J., concurring); *Freytag* v. *Commissioner,* 501 U. S. 868, 904, and n. 4 (1991) (SCALIA, J., concurring). This disposition was also designed to assure a higher quality of appointments: The Framers anticipated that the President would be less vulnerable to interest-group pressure and personal favoritism than would a collective body. "The sole and undivided responsibility of one man will naturally beget a livelier sense of duty, and a more exact regard to reputation." The Federalist No. 76, p. 387 (M. Beloff ed. 1987) (A. Hamilton); accord, 3 J. Story, Commentaries on the Constitution of the United States 374–375 (1833). The President's power to select principal officers of the United States was not left unguarded, however, as Article II further requires the "Advice and Consent of the Senate." This serves both to curb Executive abuses of the appointment power, see 3 Story, *supra,* at 376–377, and "to promote a judicious choice of [persons] for filling the offices of the union," The Federalist No. 76, at 386–387.

By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one. Hamilton observed:

> "The blame of a bad nomination would fall upon the president singly and absolutely. The censure of rejecting a good one would lie entirely at the door of the senate; aggravated by the consideration of their having counteracted the good intentions of the executive. If an ill appointment should be made, the executive for nominating, and the senate for approving, would participate, though in different degrees, in the opprobrium and disgrace." *Id.*, No. 77, at 392.

See also 3 Story, *supra*, at 375 ("If [the President] should . . . surrender the public patronage into the hands of profligate men, or low adventurers, it will be impossible for him long to retain public favour").

The prescribed manner of appointment for principal officers is also the default manner of appointment for inferior officers. "[B]ut," the Appointments Clause continues, "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." This provision, sometimes referred to as the "Excepting Clause," was added to the proposed Constitution on the last day of the Grand Convention, with little discussion. See 2 M. Farrand, Records of the Federal Convention of 1787, pp. 627–628 (1911 ed.). As one of our early opinions suggests, its obvious purpose is administrative convenience, see *United States* v. *Germaine*, 99 U. S. 508, 510 (1879)—but that convenience was deemed to outweigh the benefits of the more cumbersome procedure only with respect to the appointment of "inferior Officers." Section 323(a), which confers appointment power upon the Secretary of Transportation, can constitutionally be

applied to the appointment of Court of Criminal Appeals judges only if those judges are "inferior Officers."

Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes. Among the offices that we have found to be inferior are that of a district court clerk, *Ex parte Hennen*, 13 Pet. 225, 258 (1839), an election supervisor, *Ex parte Siebold*, 100 U. S. 371, 397–398 (1880), a vice consul charged temporarily with the duties of the consul, *United States* v. *Eaton*, 169 U. S. 331, 343 (1898), and a "United States commissioner" in district court proceedings, *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 352–354 (1931). Most recently, in *Morrison* v. *Olson*, 487 U. S. 654 (1988), we held that the independent counsel created by provisions of the Ethics in Government Act of 1978, 28 U. S. C. §§ 591–599, was an inferior officer. In reaching that conclusion, we relied on several factors: that the independent counsel was subject to removal by a higher officer (the Attorney General), that she performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited. 487 U. S., at 671–672.

Petitioners are quite correct that the last two of these conclusions do not hold with regard to the office of military judge at issue here. It is not "limited in tenure," as that phrase was used in *Morrison* to describe "appoint[ment] essentially to accomplish a single task [at the end of which] the office is terminated." *Id.*, at 672. Nor are military judges "limited in jurisdiction," as used in *Morrison* to refer to the fact that an independent counsel may investigate and prosecute only those individuals, and for only those crimes, that are within the scope of jurisdiction granted by the special three-judge appointing panel. See *Weiss*, 510 U. S., at 192 (SOUTER, J., concurring). However, *Morrison* did not purport to set forth a definitive test for whether an office is "inferior" under the Appointments Clause. To the contrary, it explicitly stated: "We need not attempt here to decide ex-

actly where the line falls between the two types of officers, because in our view [the independent counsel] clearly falls on the 'inferior officer' side of that line." 487 U. S., at 671.

To support principal-officer status, petitioners emphasize the importance of the responsibilities that Court of Criminal Appeals judges bear. They review those court-martial proceedings that result in the most serious sentences, including those "in which the sentence, as approved, extends to death, dismissal . . . , dishonorable or bad-conduct discharge, or confinement for one year or more." Art. 66(b)(1), UCMJ, 10 U. S. C. § 866(b)(1). They must ensure that the court-martial's finding of guilt and its sentence are "correct in law and fact," id., Art. 66(c), § 866(c), which includes resolution of constitutional challenges. And finally, unlike most appellate judges, Court of Criminal Appeals judges are not required to defer to the trial court's factual findings, but may independently "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." Ibid. We do not dispute that military appellate judges are charged with exercising significant authority on behalf of the United States. This, however, is also true of offices that we have held were "inferior" within the meaning of the Appointments Clause. See, e. g., Freytag v. Commissioner, 501 U. S., at 881–882 (special trial judges having "significan[t] . . . duties and discretion" are inferior officers). The exercise of "significant authority pursuant to the laws of the United States" marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in Buckley, the line between officer and nonofficer. 424 U. S., at 126.

Generally speaking, the term "inferior officer" connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a superior. It is not enough that other officers may be identified who formally maintain a

higher rank, or possess responsibilities of a greater magnitude. If that were the intention, the Constitution might have used the phrase "lesser officer." Rather, in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

This understanding of the Appointments Clause conforms with the views of the first Congress. On July 27, 1789, Congress established the first Executive department, the Department of Foreign Affairs. In so doing, it expressly designated the Secretary of the Department as a "principal officer," and his subordinate, the Chief Clerk of the Department, as an "inferior officer:

> "Section 1. *Be it enacted* . . . That there shall be an Executive department, to be denominated the Department of Foreign Affairs, and that there shall be a principal officer therein, to be called the Secretary for the Department of Foreign Affairs, who shall perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President of the United States, agreeable to the Constitution, relative to [matters respecting foreign affairs]; and furthermore, that the said principal officer shall conduct the business of the said department in such manner as the President of the United States shall from time to time order or instruct.
> "Sec. 2. *And be it further enacted,* That there shall be in the said department, an inferior officer, to be appointed by the said principal officer, and to be employed therein as he shall deem proper, and to be called the chief Clerk in the Department of Foreign Affairs. . . ." Ch. 4, 1 Stat. 28.

Congress used similar language in establishing the Department of War, repeatedly referring to the Secretary of that department as a "principal officer," and the Chief Clerk, who would be "employed" within the Department as the Secretary "shall deem proper," as an "inferior officer." Ch. 7, 1 Stat. 49.

Supervision of the work of Court of Criminal Appeals judges is divided between the Judge Advocate General (who in the Coast Guard is subordinate to the Secretary of Transportation) and the Court of Appeals for the Armed Forces. The Judge Advocate General exercises administrative oversight over the Court of Criminal Appeals. He is charged with the responsibility to "prescribe uniform rules of procedure" for the court, and must "meet periodically [with other Judge Advocates General] to formulate policies and procedure in regard to review of court-martial cases." Art. 66(f), UCMJ, 10 U. S. C. § 866(f). It is conceded by the parties that the Judge Advocate General may also remove a Court of Criminal Appeals judge from his judicial assignment without cause. The power to remove officers, we have recognized, is a powerful tool for control. *Bowsher* v. *Synar*, 478 U. S. 714, 727 (1986); *Myers* v. *United States*, 272 U. S. 52 (1926).

The Judge Advocate General's control over Court of Criminal Appeals judges is, to be sure, not complete. He may not attempt to influence (by threat of removal or otherwise) the outcome of individual proceedings, Art. 37, UCMJ, 10 U. S. C. § 837, and has no power to reverse decisions of the court. This latter power does reside, however, in another Executive Branch entity, the Court of Appeals for the Armed Forces.[2] That court reviews every decision of the

---

[2] Article 141 of the UCMJ, 10 U. S. C. § 941, states that the Court of Appeals for the Armed Forces "is established under article I of the Constitution," and "is located for administrative purposes only in the Department of Defense." Although the statute does not specify the court's "location" for nonadministrative purposes, other provisions of the UCMJ make clear that it is within the Executive Branch. The court reviews the judg-

Courts of Criminal Appeals in which: (a) the sentence extends to death; (b) the Judge Advocate General orders such review; or (c) the court itself grants review upon petition of the accused. *Id.*, Art. 67(a), §867(a). The scope of review is narrower than that exercised by the Court of Criminal Appeals: so long as there is some competent evidence in the record to establish each element of the offense beyond a reasonable doubt, the Court of Appeals for the Armed Forces will not reevaluate the facts. *Id.*, Art. 67(c), §867(c); *United States* v. *Wilson*, 6 M. J. 214 (C. M. A. 1979). This limitation upon review does not in our opinion render the judges of the Court of Criminal Appeals principal officers. What is significant is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers.

Finally, petitioners argue that *Freytag* v. *Commissioner*, 501 U. S. 868 (1991), which held that special trial judges charged with assisting Tax Court judges were inferior officers and could be appointed by the Chief Judge of the Tax Court, suggests that Court of Criminal Appeals judges are principal officers. Petitioners contend that Court of Criminal Appeals judges more closely resemble Tax Court judges—who we implied (according to petitioners) were principal officers—than they do special trial judges. We note initially that *Freytag* does not hold that Tax Court judges are principal officers; only the appointment of special trial judges was at issue in that case. Moreover, there are two significant distinctions between Tax Court judges and Court of Criminal Appeals judges. First, there is no Execu-

---

ments of only military tribunals, *id.*, Art. 67, §867; its judges must meet annually in committee with the Judge Advocates General and two members appointed by the Secretary of Defense to survey the operation of the military justice system, *id.*, Art. 146, §946; and the President may remove its judges for neglect of duty, misconduct, or mental or physical disability, *id.*, Art. 142(c), §942(c).

tive Branch tribunal comparable to the Court of Appeals for the Armed Forces that reviews the work of the Tax Court; its decisions are appealable only to courts of the Third Branch. 26 U. S. C. § 7482. And second, there is no officer comparable to a Judge Advocate General who supervises the work of the Tax Court, with power to determine its procedural rules, to remove any judge without cause, and to order any decision submitted for review. *Freytag* does not control our decision here.

\*      \*      \*

We conclude that 49 U. S. C. § 323(a) authorizes the Secretary of Transportation to appoint judges of the Coast Guard Court of Criminal Appeals; and that such appointment is in conformity with the Appointments Clause of the Constitution, since those judges are "inferior Officers" within the meaning of that provision, by reason of the supervision over their work exercised by the General Counsel of the Department of Transportation in his capacity as Judge Advocate General and the Court of Appeals for the Armed Forces. The judicial appointments at issue in this case are therefore valid.

Accordingly, we affirm the judgment of the Court of Appeals for the Armed Forces with respect to each petitioner.

*It is so ordered.*

JUSTICE SOUTER, concurring in part and concurring in the judgment.

I join in Parts I and II of the Court's opinion and agree with the reasoning in Part III insofar as it describes an important, and even necessary, reason for holding judges of the Coast Guard Court of Criminal Appeals to be inferior officers within the meaning of the Appointments Clause, U. S. Const., Art. II, § 2, cl. 2. The Court states that "[g]enerally speaking, the term 'inferior officer' connotes a relationship [of supervision and direction] with some higher

ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Ante*, at 662. The Court goes on to show that administrative supervision of these judges by the Judge Advocate General of the Coast Guard, combined with his power to control them by removal from a case, establishes that the intermediate appellate judges here have the necessary superior. With this conclusion I agree, but unlike the Court I am not prepared to decide on that basis alone that these judges are inferior officers.

Because the term "inferior officer" implies an official superior, one who has no superior is not an inferior officer. This unexceptionable maxim will in some instances be dispositive of status; it might, for example, lead to the conclusion that United States district judges cannot be inferior officers, since the power of appellate review does not extend to them personally, but is limited to their judgments. See *In re Sealed Case*, 838 F. 2d 476, 483 (CADC), rev'd *sub nom. Morrison* v. *Olson*, 487 U. S. 654 (1988) (suggesting that "lower federal judges . . . are principal officers" because they are "not subject to personal supervision," 838 F. 2d, at 483); cf. *ante*, at 665.

It does not follow, however, that if one is subject to some supervision and control, one is an inferior officer. Having a superior officer is necessary for inferior officer status, but not sufficient to establish it. See, *e. g., Morrison* v. *Olson*, 487 U. S., at 654, 722 ("To be sure, it is not a *sufficient* condition for 'inferior' officer status that one be subordinate to a principal officer. Even an officer who is subordinate to a department head can be a principal officer") (SCALIA, J., dissenting). Accordingly, in *Morrison*, the Court's determination that the independent counsel was "to some degree 'inferior'" to the Attorney General, see *id.*, at 671, did not end the enquiry. The Court went on to weigh the duties, jurisdiction, and tenure associated with the office, *id.*, at 671–672, before concluding that the independent counsel was an infe-

rior officer. Thus, under *Morrison*, the Solicitor General of the United States, for example, may well be a principal officer, despite his statutory "inferiority" to the Attorney General. See, *e. g.*, 28 U. S. C. § 505 (directing Presidential appointment, with the advice and consent of the Senate, of a Solicitor General to "assist the Attorney General in the performance of his duties"). The mere existence of a "superior" officer is not dispositive.

In this case, as the Court persuasively shows, the Judge Advocate General has substantial supervisory authority over the judges of the Coast Guard Court of Criminal Appeals. As the Court notes, the Judge Advocate General prescribes rules of procedure for the Court of Criminal Appeals, formulates policies for review of court-martial cases, and is authorized to remove judges from their judicial assignments without cause. See *ante*, at 664. While these facts establish that the condition of supervision and control necessary for inferior officer status has been met, I am wary of treating them as sufficient to demonstrate that the judges of the Court of Criminal Appeals are actually inferior officers under the Constitution.

In having to go beyond the Court's opinion to decide that the criminal appeals judges are inferior officers, I do not claim the convenience of a single sufficient condition, and, indeed, at this stage of the Court's thinking on the matter, I would not try to derive a single rule of sufficiency. What is needed, instead, is a detailed look at the powers and duties of these judges to see whether reasons favoring their inferior officer status within the constitutional scheme weigh more heavily than those to the contrary. Having tried to do this in a concurring opinion in *Weiss* v. *United States*, 510 U. S. 163, 182 (1994), I will not repeat the essay. See *id.*, at 192–194 (reviewing the *Morrison* factors, including tenure, jurisdiction, duties, and removal; concluding that because it is "hard to say with any certainty" whether Courts of Military Review judges should be considered principal or inferior of-

ficers, deference to the political branches' judgment is appropriate). Here it is enough to add that after the passage of three Terms since writing in *Weiss,* I am unrepentant. I therefore join not only in the Court's conclusion that the necessary supervisory condition for inferior officer status is satisfied here, but in the Court's ultimate holding that the judges of the Coast Guard Court of Criminal Appeals are inferior officers within the meaning of the Appointments Clause.